12-2720-cv
*M.W. v. N.Y.C. Dep't of Educ.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: March 13, 2013      Decided: July 29, 2013)

Docket No. 12-2720-cv

_____

M.W., BY HIS PARENTS, S.W. AND E.W.,

*Plaintiffs-Appellants*,

−v.−

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee*.

_____

Before:

     WALKER, WESLEY, DRONEY, *Circuit Judges*.

Appeal from the order of the United States District Court for the Eastern District of New York (Weinstein, *J.*), entered on June 15, 2012, granting summary judgment for Defendant-Appellee New York City Department of Education and denying tuition reimbursement for Plaintiffs-Appellants after their unilateral placement of their child into a private school.

AFFIRMED

_____

GARY S. MAYERSON (Tracey Spencer Walsh, Maria C. McGinley, *on the brief*), Mayerson & Associates, New York, NY, *for Plaintiffs-Appellants*.

SUZANNE K. COLT, (Pamela Seider Dolgow, John Buhta, Gail Eckstein, G. Christopher Harris, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York City Law Department, New York, NY, *for Defendant-Appellee*.

WESLEY, *Circuit Judge*:

S.W. ("Dad") and E.W. ("Mom") enrolled M.W., their autistic child, in a private school after concluding that the New York City Department of Education's ("DOE") individualized education program failed to provide him with a free and appropriate public education as required by the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. Subsequently, the Parents filed a due-process complaint against the DOE seeking tuition reimbursement. After twelve hearing days, an impartial hearing officer granted them that relief. The DOE appealed to a state review officer, who reversed that decision. The Parents then filed a civil action in United States District Court for the Eastern District of New York (Weinstein, *J.*), which affirmed the order denying tuition

reimbursement.  The Parents appeal principally contending that the individualized education program's integrated co-teaching services violated the IDEA's least restrictive environment mandate by placing their child in a classroom with as many as twelve other students who also had individualized education programs.  We **AFFIRM**.

**Background**

**I.   The Legal Framework**

The IDEA requires New York state to "provide disabled children with a free and appropriate public education ('FAPE')."  *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012) (citation omitted).  Accordingly, the DOE, through a Committee on Special Education ("CSE"), must produce, in writing, an individualized education program ("IEP"), *see* 20 U.S.C. § 1414(d), that "describes the specially designed instruction and services that will enable the child to meet" stated educational objectives and is reasonably calculated to give educational benefits to the child.  *R.E.*, 694 F.3d at 175 (internal quotation marks and citation omitted).  Should a parent believe that the school district breached these IDEA duties by failing to provide their disabled child a FAPE, the parent may unilaterally

place their child in a private school at their own financial risk and seek tuition reimbursement. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993).

To begin the tuition-reimbursement process, a parent must first file a due-process complaint which triggers an administrative-review process that begins with a hearing in front of an impartial hearing officer ("IHO"). *See* 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. L. § 4404(1). The three-pronged *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing: (1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement[1] if (2) they

---

[1] The Parents invite us to expressly hold that the DOE carries their New York Education Law § 4404(1)(c) burden all the way into federal court, which would require us to decide whether the IDEA preempts that law. We do not need to address that argument "[b]ecause the State Review Officer[] in the case[] at bar concluded that the IEP[ was] proper, and the courts are bound to exhibit deference to that decision[;] the burden of demonstrating that the respective Review Officers erred is properly understood to fall on plaintiffs . . . , which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipose." *M.H. v. NYC Dep't of Educ.*, 685 F.3d 217, 225 n.3 (2d Cir. 2012). Here, the evidence is not in equipose. Moreover, it "is incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal." *W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.*, 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010).

establish that their unilateral placement was appropriate and (3) the equities favor them. *See R.E.*, 694 F.3d at 184-85 (citing *Carter*, 510 U.S. at 7; *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985)). A state review officer ("SRO") evaluates appeals from an IHO's decision, *see* N.Y. Educ. Law § 4404(2), and either party may seek review of an SRO decision by bringing a civil action in federal court, *see* 20 U.S.C. § 1415(i)(2)(A).

## II. Statement of Facts

### A. M.W.

M.W. is an autistic boy with Pervasive Developmental Disorder, Attention Deficit Hyperactivity Disorder, certain speech and language disorders, and fine and gross motor deficits. Despite these setbacks, M.W. has an average IQ; he is bright and can learn. His autism and developmental disorders, however, present behavioral and social-emotional problems that have resulted in academic under-performance and have required speech, occupational, and physical therapies. M.W. also requires direct, hands-on supervision during the school day from a paraprofessional, who helps him stay focused when his attention strays and calm in the event of a behavioral crisis.

After the Parents rejected the IEP for the 2009-2010 school year, M.W. attended Luria, a Montessori school, where he had the support of his full-time paraprofessional in a classroom designed for typically developing students. On January 30, 2010, Mom sent an email to Luria indicating a desire to re-enroll M.W. for the 2010-2011 school year before the CSE developed the contested IEP subject to this appeal. Shortly thereafter, Mom submitted an application to Luria which included a tuition contract and down payment to hold M.W.'s spot.

Luria teachers do not use formal assessments to track progress and rely on "a lot [of] note-taking and observation" to track the child's progress. *See* Tr. 937. Though M.W. progressed socially during the 2009-2010 school year, he continued to have "a lot of behavioral issues that [we]re getting in the way of his progress" through the 2010-2011 school year. *Id.* at 921. When these behavioral issues disrupted the class, his paraprofessional removed him from the classroom to work with him outside, sometimes on the floor.[2] *Id.* at 945-50.

---

[2] The record does not clearly set out the amount of time M.W. spent outside the classroom during both the 2009-2010 school year and the 2010-2011 school year. For the 2009-2010 school

**B.    M.W.'s Individualized Education Program**

On June 10, 2010, the CSE convened to develop M.W.'s 2010-2011 IEP.  The following individuals constituted the CSE: (1) Mom; (2) Sara Malasky, M.W.'s general education teacher, who participated *via* telephone; (3) Chanie Graus, a school psychologist who acted as a school-district representative; (4) a special education teacher; and (5) a parent representative.  M.W. was seven years old, and the IEP was for his second-grade year, 2010-2011.

The IEP described M.W. as a seven-year-old autistic child of average intelligence with Pervasive Developmental Disorder.  Despite his disorders, the IEP recognized that M.W. had "made progress . . . in the area of peer interactions" and, during the previous year at Luria, M.W. had made friends and was "able to participate in a

year, M.W.'s Floor Time therapist worked with him outside the classroom.  When sent to observe M.W. before the CSE meeting that produced the challenged IEP, the DOE representative observed M.W. on the hallway floor having an emotional breakdown during his Floor Time therapy.  Around September of the 2010-2011 school year, M.W. developed Tourette Syndrome which caused a frequently disruptive tic.  For that year, M.W. spent a significant amount of time outside of the classroom to work one-on-one with his paraprofessional as needed to control his disruptions.  *See* Tr. 816, 824-25, 845-46, 854, 939, 945-50.  Additionally, M.W.'s teacher and paraprofessional would plan ahead to have him removed from the classroom for instruction, sometimes with another student.  Tr. 808, 923.

continuous flow of back and forth interactions" with his peers. Sealed App'x 1847. The IEP, however, also noted that M.W. had significant self-regulation difficulties, became frustrated easily, and struggled to calm himself down in the event of a behavioral crisis. *Id.*

The IEP recommended placement in a general education environment with integrated co-teaching ("ICT") services with a 12:1 staffing ratio, five days a week, for a ten-month school year.[3] The IEP also provided M.W. with a full-time behavioral management paraprofessional to give him one-on-one help self-regulating in times of behavioral crisis, and these other related services:

|   | Service | Sessions x Week | Duration | Students |
|---|---|---|---|---|
| 1 | Counseling | 1 x week | 30 mins. | 3 |
| 2 | Occupational Therapy | 3 x week | 30 mins. | 1 |
| 3 | Physical Therapy | 2 x week | 30 mins. | 1 |
| 4 | Speech/Language Therapy | 2 x week | 30 mins. | 1 |

---

[3] The 12:1 staffing ratio means that one special education teacher would provide ICT services for up to twelve IEP students, the statutory maximum, in a classroom that also included typically developing students, a general education curriculum, and a general education teacher. For a detailed discussion of ICT services, *see* Discussion, *infra*, at XX.

| 5 | Speech/Language Therapy | 1 x week | 30 mins. | 2 |
|---|---|---|---|---|

Sealed App'x 1860.

Finally, the IEP concluded that M.W.'s "behavior seriously interfere[d] with instruction and require[d] additional adult support." *Id.* 1847. Based on those conclusions, the IEP required a behavioral intervention plan ("BIP"), which was incorporated in the IEP. *Id.* at 1860. The BIP identified "emotional meltdowns," "poor self-regulation," and "poor attention" as the behavioral difficulties that impaired M.W.'s academic progress and recommended a reward system, praise and encouragement, and positive modeling as strategies to modify those behaviors. *Id.* at 1862. The goal was to teach M.W. to become more attentive and focused and to better control himself when frustrated. *Id.* To implement those strategies, M.W.'s teacher, paraprofessional, and the Parents were to collaborate. The BIP did not quantify data relating to the frequency of M.W.'s "meltdowns" because Luria did not provide a functional behavior assessment ("FBA"), and the DOE did not request or develop one.

On July 1, 2010, the DOE sent a letter to M.W.'s Parents that classified M.W. as an autistic student and

recommended an ICT classroom[4] at P.S. 197, the Ocean School, with the related services that the IEP recommended.  Mom visited the school, decided to keep M.W. at Luria, and immediately began the administrative-review process seeking reimbursement for the 2010-2011 school year.

### C.    Administrative Review

On July 8, 2010, the Parents filed their demand for due process and requested a hearing.  The Parents subsequently amended their demands on September 29, 2010.  On May 2, 2011, the Parents submitted their closing brief after 12 hearing days that took place over the entire school year.  In relevant parts, the Parents argued that the IEP would have denied M.W. a FAPE because the IEP Team created a BIP without the benefit of an FBA and the IEP failed to provide parent counseling and training as a related service.  The Parents also argued that the P.S. 197 placement was defective because the recommended 10-month program exposed

---

[4]  The letter actually recommended Collaborative Team Teaching ("CTT").  CTT is equivalent to ICT.  *See* http://www.p12.nysed.gov/specialed/publications/policy/schoolagec ontinuum.html ("New York City (NYC) has used the term 'collaborative team teaching' (CTT) to identify a service that meets the regulatory definition of integrated co-teaching services.").  In any event, the parties do not mention or argue over this distinction.

M.W. to regression risks. Finally, the Parents argued that the IEP assigned M.W. to an overly restrictive environment.

The IHO expressly agreed with the Parents regarding the BIP, the omission of parental counseling, and the inadequacy of a 10-month program. Though the IHO mentioned the least restrictive environment requirement in passing, she made no explicit findings as to whether a general education environment with ICT services would be too restrictive.[5] *See* Sealed App'x 2155. The IHO found Luria to be an appropriate placement and that the equities favored the Parents. Accordingly, the IHO ordered that the Parents be reimbursed, and the DOE sought review by a SRO. The SRO reversed the IHO's determinations and denied tuition reimbursement. Relying heavily on the SRO's analysis, the district court affirmed that decision, and the Parents appealed.

---

[5] The IHO found that the ICT classroom, generally, was inappropriate because the class size was too large and the decision to make that placement was unsupported by documentary evidence. IHO Decision at 27. The IHO also summarily concluded that ICT service was an inappropriate support system for M.W.'s developmental problems. *Id.* Those criticisms, however, were not tied to a restrictiveness analysis and offer no insight into Parents' least restrictive environment arguments on appeal.

**Discussion**

**I.    Standard of Review and Burdens of Proof**

We undergo a circumscribed *de novo* review of a district court's grant of summary judgment in the IDEA context because the "responsibility for determining whether a challenged IEP will provide a child with [a FAPE] rests in the first instance with administrative hearing and review officers."  *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012).  Summary judgment in the IDEA context, therefore, is only a "pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (internal quotation marks and citation omitted).  This review "'requires a more critical appraisal of the agency determination than clear-error review'" but "'falls well short of complete *de novo* review.'" *M.H.*, 685 F.3d at 244 (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086-87 (1st Cir. 1993) (internal citations omitted)).  Accordingly, our *de novo* review only seeks to independently verify that the administrative record supports the district court's determination that a student's IEP was adequate.  *See R.E.*, 694 F.3d at 184.

In undertaking this independent review, we are further restrained by our lack of specialized knowledge and educational expertise; "we must defer to the administrative decision [particularly where] the state officer's review 'has been thorough and careful.'"  *See id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)).  While we will not "rubber stamp" administrative decisions, we remain equally mindful that we cannot substitute our own "notions of sound educational policy for those of the school authorities" under review.  *M.H.*, 685 F.3d at 240.  Furthermore, when, as here, "an IHO and SRO reach conflicting conclusions, '[w]e defer to the final decision of the state authorities,' that is, the SRO's decision."  *R.E.*, 694 F.3d at 189 (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)).

Recently, we parsed the amount of deference an SRO's determination deserves and concluded that it "depends on the quality of that opinion."  *See R.E.,* 694 F.3d at 189. "Reviewing courts must look to the factors that 'normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater

familiarity with the evidence and the witnesses than the reviewing court.'" *Id.* at 189 (quoting *M.H.*, 685 F.3d at 244). Where an SRO has clearly demonstrated a better command of the record and supported her conclusions through better legal and factual analysis than an IHO, we will have little difficulty deferring to the SRO's opinion. *See id.* Accordingly, an appellant seeking to have a reviewing court credit an IHO's determination over an SRO's determination would benefit from calling our attention to an SRO's specific errors in law, fact, or reasoning.[6]

## II. Procedural Violations

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *Id.* at 189-90. Procedural violations warrant tuition reimbursement only if they "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decision[-]making process,' or 'caused a deprivation of educational benefits.'" *Id.* at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii); *A.C.*, 553 F.3d at 172). That is, parents

---

[6] By attempting to undercut the deference owed to the SRO based on her alleged personal inexperience, Parents' counsel moved us to (re)articulate these guiding principles. *See* Compl. at 8, ¶ 23.

must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process. Of course, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *Id.*

Here, the Parents allege that the DOE committed two procedural violations: it failed to undertake an FBA in developing the BIP and it failed to include parental training and counseling in the IEP. The Parents also assert that the SRO impermissibly relied on retrospective testimony to justify those omissions.

**A.   Behavioral Intervention Plan**

An FBA provides an "identification of [a disabled student's] problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(r)). "New York regulations require the department to conduct an FBA for a student 'whose behavior impedes his or her learning or that of others.'" *See R.E.,* 694 F.3d at 190 (quoting N.Y. Comp.

Codes R. & Regs. tit. 8 § 200.4(b)(1)(v)). Those regulations, however, only require an FBA "*as necessary* to ascertain the physical, mental, behavioral and emotional factors which contribute to [a] suspected disabilit[y]." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(1)(v) (emphasis added).

Though the "IDEA incorporates some but not all state law concerning special education," these regulations do not raise the IDEA bar by rendering IEP's developed without an FBA legally inadequate. *See A.C.*, 553 F.3d at 172 n.1 (quoting *Bay Shore Union Free Sch. Dist. v. Kain ex rel. Kain*, 485 F.3d 730, 734 (2d Cir. 2007)). The IDEA only requires a school district to "consider the use of positive behavioral interventions and supports, and other strategies" when a child's behavior impedes learning. *See id.* at 172 (quoting 20 U.S.C. § 1414(d)(3)(B)(i)) (internal quotation marks omitted). An FBA omission does, however, cause us to "take particular care to ensure that the IEP adequately addresses the child's problem behaviors." *R.E.*, 694 F.3d at 190. Two cases chart our course. *See R.E.*, 694 F.3d at 192-95; *A.C.*, 553 F.3d at 172-73.

In *A.C.*, we concluded that the failure to conduct an FBA did not make an IEP legally inadequate because it noted

(1) the student's attention problems; (2) the student's need for a personal aide to help the student focus during class; and (3) the student's need for psychiatric and psychological services. *A.C.*, 553 F.3d at 172. In *R.E.* we considered the effect of an FBA omission for three separate students. *See R.E.*, 694 F.3d at 192-95. For one student, we concluded that an FBA omission did not deny a FAPE where (1) the CSE reviewed documents regarding the student's behavior, and (2) the IEP provided strategies to address those behaviors, "including the use of a 1:1 aide to help him focus." *Id.* at 193. Moreover, we have decided that whether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are "precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers." *A.C.*, 553 F.3d at 172 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003)) (internal quotation marks omitted).

Failure to conduct an FBA, therefore, does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior. *See, e.g., id.* Where the IEP actually includes a BIP, parents should

at least suggest how the lack of an FBA resulted in the BIP's inadequacy or prevented meaningful decision-making. *See R.E.* at 189-90. For example, parents could argue that an FBA would have exposed a BIP's obsolete assessment of the student's behavioral problems or that the recommended behavior-modification strategies failed to accommodate the frequency or intensity of the student's behavioral problems. Here, however, the Parents summarily argue that failure to conduct an FBA made the IEP legally defective; the record belies those assertions.

As an initial matter, the IHO's FBA and BIP analysis consisted of a single sentence without citation to the administrative record: "Lastly, I find there was no FBA developed and the BIP was developed without parent or teacher involvement and I find the BIP was not appropriate." IHO Decision at 28. By contrast, the SRO provided an in-depth, four-page discussion of the issue replete with legal and factual analysis. *See* SRO Decision at 17-20. The SRO found that the IHO's finding was unsubstantiated by a record which clearly established M.W.'s behavioral problems, identified strategies to manage those problems, and recommended a collaborative intervention plan between the Parents, teacher, and paraprofessional.

The SRO concluded that the BIP accurately described the behaviors that interfered with learning: "emotional meltdowns," poor self-regulation, and poor attention.  In support of her analysis, the SRO relied upon, *inter alia*, the Luria progress reports, the Floor Time therapist's report, and Graus's in-class observations of M.W., all of which describe those behavioral difficulties in detail.  *See* SRO Decision at 19 (citing Dist. Ex. 5-12).  The Parents confirm the accuracy of those descriptions and do not contend that the IEP misidentified or overlooked their son's behavioral issues.  *See* Parents' Local Rule 56.1 Statement of Material Facts ¶ 5.  Accordingly, we agree with the SRO's determination that the BIP adequately described M.W.'s behavioral impediments.

The SRO also concluded that the BIP was consistent with the information available to the CSE and that the intervention services were adequate because they provided a broad, collaborative approach to implement specific strategies to modify those behaviors on a daily, one-on-one basis.  The Parents do not contend that M.W. needed more or less attention.  Additionally, the BIP recommended that M.W. be provided with a reward system, praise, encouragement, and positive modeling to learn to adjust his behavior within a

collaborative support system between parent, teacher, and paraprofessional. The Parents do not attack those strategies. The Parents have simply failed to articulate a single reason why an FBA was required for a legally valid BIP.

We therefore affirm the SRO's determination that the "hearing record does not support the impartial hearing officer's determination that the lack of an FBA rose to the level of denying the student a FAPE where the IEP addressed behavioral needs." SRO Decision at 20. As in *R.E.*, (1) the CSE reviewed documents regarding the student's behavior, and (2) the IEP provided strategies to address those behaviors, including the use of a paraprofessional. *R.E.*, 694 F.3d at 193.

## B. Parental Counseling

Next, the Parents argue that the IEP's failure to include parental counseling denied M.W. a FAPE. To enable parents to "perform appropriate follow-up intervention activities at home," New York requires that an IEP provide parents of autistic students training and counseling. *See* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.13(d). "Parent counseling and training means assisting parents in understanding the special needs of their child; providing

parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program." *Id.* § 200.1(kk) (emphasis omitted). The regulations contemplate parental counseling for the educational benefit of the disabled student by ensuring that the parents are equipped with the skills and knowledge necessary to continue and implement the student's IEP at home.

We have previously described counseling omissions as procedural violations "less serious than the omission of an FBA" because "the presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the plan." *R.E.*, 694 F.3d at 191. "Moreover, because school districts are required . . . to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP." *Id.* (citing N.Y. Comp. Codes R. & Regs. tit. 8 § 200.13(d)). If a parent wants counseling for her own sake, New York provides her a remedy. Accordingly, failure to provide counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement. *See id.*

Here, the IHO again summarily decided that parent counseling and training was required and that parent workshops that would have been provided to the Parents by the Ocean School would not give the Parents the tools necessary to perform follow-up at home. IHO Decision at 27-28. The IHO, however, did not explain those conclusions. The SRO concluded that the counseling omission did not deny M.W. a FAPE because Mom was a certified special education teacher who had received, through her own initiative, training and counseling in the therapies that M.W. had previously used, and because the public school assigned to M.W. provided training and counseling. The SRO also noted that the BIP required collaboration between paraprofessional, the Parents, and teacher in order to implement and support the recommended behavior-modification strategies.

We defer to that analysis. The Parents have not persuaded us that the parental counseling omission would deprive M.W. of FAPE. The SRO's analysis noted that Mom's experience and the supports in the BIP provide adequate assurance that M.W.'s developmental plan and education would continue at home.

## C.   Retrospective Justifications

The Parents assert that the SRO routinely relied upon impermissible retrospective justifications to fill in the IEP's inadequacies.  In *R.E.*, we held "that retrospective testimony that the school district *would have* provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* proceeding."  *R.E.*, 694 F.3d at 186. (emphasis added).  However, the case also expressly "reject[ed] . . . a rigid 'four corners' rule prohibiting testimony that goes beyond the face of the IEP. While testimony that materially alters the written plan is not permitted, testimony may be received that *explains* or *justifies* the services listed in the IEP."  *Id.* (emphasis added).  For example:

> [I]f an IEP states that a specific
> teaching method will be used to instruct a
> student, the school district may introduce
> testimony at the subsequent hearing to
> describe that teaching method and explain
> why it was appropriate for the student.
> The district, however, may not introduce
> testimony that a different teaching
> method, not mentioned in the IEP, would
> have been used.

*Id.* at 186-87.

Here, Parents contend that the SRO impermissibly credited retrospective testimony that justified the FBA

omission based on the BIP's broad, collaborative support strategies and how those strategies would change as the student's needs changed.  That argument, however, misses the SRO's central analysis: the BIP was developed with specific goals, strategies, and supports, but the collaborative approach ensured that implementation could change as M.W.'s needs changed and ensured that behavioral modification strategies would continue at home.  That seems especially appropriate when a student's autism presents unique challenges each day.  Accordingly, the analysis did not rely on retrospective justifications.  The DOE admits that there was no FBA, and the SRO did not rely upon a promise not contained in the IEP to address the omission.

The Parents also assert that reliance on Mom's educational background and the placement school's counseling programs retrospectively justifies the omission of parental counseling.  But, as we have just stated, when the IEP suffers from a conceded procedural infirmity, we first review whether that procedural violation substantively deprived the student of a FAPE before determining whether the SRO corrected the substantive failure by impermissibly crediting future promises.  In making her determination, the SRO did not conclude that the IEP's omission of parental

counseling denied M.W. of a FAPE and that the omission was made sound by promises not contained in the IEP. Instead, the SRO concluded that the parental counseling omission did not deny M.W. a FAPE in the first instance because of the BIP's collaborative approach to behavior modification, Mom's education, and the school workshops. The SRO concluded that the Parents were equipped to manage M.W.'s needs without New York's mandated counseling. Accordingly, the SRO did not rely upon impermissible retrospection and we defer to her analysis.

**III.    Substantive Adequacy and Least Restrictive**
**Environment**

The Parents also challenge the substantive adequacy of the IEP. "Substantive inadequacy automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190. The "state need not 'maximize the potential of handicapped children,' but the door of public education must be opened in a 'meaningful way.'" *P. ex. rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008) (quoting *Walczak*, 142 F.3d at 130 (internal quotation marks omitted)). That is, the "IEP must provide the opportunity for more than only 'trivial advancement.'" *Id.*

**A.    Least Restrictive Environment**

The IDEA "expresses a strong preference" for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment ("LRE"). *Walczak*, 142 F.3d at 122.  Specifically, the IDEA provides that disabled children be educated "[t]o the maximum extent *appropriate* . . . with children who are not disabled," and cautions that "special classes, separate schooling, or *other removal* of children with disabilities from the regular educational environment" should only occur "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A) (emphasis added).

"[W]hile mainstreaming is an important objective, we are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *Newington*, 546 F.3d at 119 (quotation marks and citation omitted).  The "tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much

as circumstances allow" dictates a "case-by-case analysis in reviewing whether both of those goals have been *optimally* accommodated under particular circumstances." *Id.* (emphasis added)

We have previously used a two-pronged test to determine whether a school district has met the LRE mandate mindful of "our deferential position with respect to state educational authorities crafting educational policy" when applying it. *Id.* at 120. First, can the student "be satisfactorily educated in the regular classroom, with the use of supplemental aids and services[?]" *Id.* at 121. To answer that question we consider: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students." *Id.* at 120. If a school district actually "remov[es] the child from [a] regular classroom [into] a segregated, special education class," a second question confronts us: "whether the school has included the child in school programs with nondisabled children to the

maximum extent appropriate."  *Id.* (quotation omitted).

These two questions, however, do not adequately address M.W.'s placement in a general education environment with integrated co-teaching services, a placement somewhere in between a regular classroom and a segregated, special education classroom.  New York regulations set out the definition of integrated co-teaching.

"To enable students with disabilities to be educated with nondisabled students to the maximum extent appropriate, specially designed instruction and supplementary services may be provided in the regular class, including, as appropriate, providing related services, resource room programs and special class programs within the general education classroom."  N.Y. Comp. Codes R. & Regs. tit. 8 § 200.6(a)(1).  "A school district may include integrated co-teaching services in its continuum of services." *Id.* at § 200.6(g).

"Integrated co-teaching services means the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students."  *Id.*  "The maximum number of students with disabilities receiving integrated co-teaching services in a class shall be determined in accordance with the

students' individual needs [and the] number of students with disabilities in such classes [cannot] exceed 12 students" unless a variance was provided. *Id.* at § 200.6(g)(1). At a minimum, the classroom must include a special education teacher and a general education teacher. *Id.* at § 200.6(g)(2). In contrast, a special education classroom is a "self-contained setting." *See Id.* at § 200.6(h)(4).

The Parents refer repeatedly to an "ICT classroom" and they assert that the use of ICT services makes M.W.'s placement akin to a segregated special education classroom rather than a regular classroom with supports. Accordingly, the Parents argue that the DOE failed to consider a regular classroom with additional supports. Though it is fair to say that a classroom with ICT services is not a "regular classroom," it is likewise unfair to characterize the placement as a segregated, special-education environment. *Newington*, however, does not compel a choice between the two extremes of a regular classroom and a special education classroom. *Newington* only gives us a test to use when a student is pulled out of a regular classroom and placed in a special education classroom all or some of the time. Accordingly, we do not have to decide whether this is a regular classroom or a special education classroom. Though

M.W.'s placement adds a degree of complexity to the LRE test articulated in *Newington*, we need only consider whether the placement of M.W. in a general education environment with a regular curriculum alongside typically developing peers but supplemented with a special education teacher was overly restrictive for M.W.

Both the IEP and the New York regulations characterize ICT as a *service* in a general education environment rather than a special education classroom. The IEP's "School Environment and Service Recommendation" would have placed M.W. in a general education environment for all areas of instruction. ICT was listed as a supplementary aid and service, along with the use of a behavior management paraprofessional and M.W.'s other related services. The IEP also noted that no areas of instruction were to be in a special-class environment.

Moreover, both the IHO and SRO treated ICT as a service and not a special-education classroom. The IHO concluded that the DOE "failed to present any evidence that an ICT program . . . provided sufficient *special education support* for [M.W.] in the classroom." IHO Decision at 26 (emphasis added). A close reading of the SRO's opinion reveals that she also characterized the use of a special education

teacher, paraprofessional, and related services as "provid[ing] special education *support*" and that M.W. deserved to be in a "general education curriculum" alongside typically developing peers on account of his high functionality. *See* SRO Decision at 16 (emphasis added). On these facts, M.W. has not persuaded us that the ICT services were too restrictive and the record does not reflect that New York's statutory schema incorrectly classifies ICT services as a placement less restrictive than a segregated, special-education classroom. Accordingly, we decline to analyze M.W.'s ICT classroom placement as a placement in a special-education classroom.

The question then in this case is whether the ICT services were appropriate supports for M.W. within a general education environment. The Parents contend that a classroom with ICT services was overly restrictive because M.W. had been educated alongside "exclusively non-disabled peers . . . [and that he had proven] that with support, he could 'make it' in a far less restrictive environment." Br. at 22. The Parents rely upon the IDEA's prescription that children be educated with non-disabled children *to the maximum* extent appropriate, *see* 20 U.S.C. § 1412(a)(5)(A), whereas the FAPE mandate only requires an "appropriate public education."

They assert that any classroom restrictions that result in raising the educational level afforded to the student beyond what can be deemed "appropriate" are therefore impermissible, maintaining that the "test is not whether a student can learn 'more' or learn 'better' in a more restrictive setting, but simply whether the student can learn 'satisfactorily' with aids and services in a less restrictive environment." Br. at 22.  Our cases, however, do not stand for that robust proposition.

The IDEA seeks to provide disabled children with a meaningful public education while protecting them from being inappropriately sequestered in a special-education classroom.  *Burlington*, 471 U.S. at 373 ("Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes.").  *Newington* recognizes this apparent tension and instructs us to weigh the presumption of mainstreaming against educational benefits obtained in more restrictive settings through a case-by-case analysis that seeks an *optimal* result across the two requirements.  Moreover, *Newington* characterized the LRE requirement as a "strong preference" and cautioned that the presumption in favor of mainstreaming must be weighed

against the importance of providing an appropriate education to handicapped students; sometimes education in a regular classroom cannot be achieved satisfactorily. *Newington*, 546 F.3d at 119. But, as just articulated, *Newington* does not compel a choice between a regular classroom and a special education classroom. Likewise, the IDEA contemplates that the DOE will consider a continuum of related services and options that will be a "best fit" for the student in question.

Accordingly, the Parents' position ignores that we weigh the benefits of a less-restrictive environment against the backdrop of the educational benefits a child can receive in such an environment. Therefore, we do not assume that moving M.W. from an educational setting where he experienced some progress into a more restrictive setting, *ipso facto*, warrants tuition reimbursement for a private placement. Instead, we examine whether the preponderance of the evidence supports the SRO's conclusion that the IEP provided M.W. an appropriate education in his least restrictive environment.

The Parents also contend that the addition of ICT services were inappropriate and too restrictive because M.W. would be learning alongside as many as twelve other IEP

students. We reject the unsupported assertion that the restrictiveness of the educational environment and related services turns exclusively on the number of IEP students present. "[T]he objective of providing an education tailored to each student's particular needs does not admit of statistical generalizations." *Newington*, 546 F.3d at 121-22.

Accordingly, we consider whether the ICT services were overly restrictive along the continuum of services available to M.W. in a general education environment. The IHO did not make any conclusions or findings regarding the LRE *per se*. She did, however, conclude in summary fashion that the district "presented no documentary evidence to support the appropriateness of the ICT placement" in light of M.W.'s various developmental problems. IHO Opinion at 27. Because the SRO thoroughly addressed the LRE mandate and the appropriateness of the ICT services, we defer to her conclusions.

A careful review of the record reveals that M.W.'s autism and related disorders caused behavioral issues that disrupted class and impaired his educational development. Chanie Graus, the psychologist and DOE representative, concluded that M.W. would benefit "from two teachers in the

classroom versus one [because] it's really important for [M.W.] to be exposed to typically developing students, since he's under the autistic spectrum, but he's high functioning." Tr. 433-34. Graus thought that putting M.W. in a segregated special education classroom "would really be detrimental to him." *Id.* at 434. Taking into consideration his "average I.Q., and that he's only mildly delayed in comparison to other students his grade," Graus said they wanted M.W. "to be challenged and exposed to a general education curriculum." *Id*. At the IEP meeting, no one expressed disagreement with the recommendation for an ICT classroom. Graus also concluded that a regular general education classroom would be inappropriate because of his emotional difficulties and that having a special education teacher would be a benefit. *Id.* at 437.

A preponderance of the evidence supports the SRO's conclusions that the IEP recommendation of ICT services in a general education setting was appropriate and reasonable. The DOE was not required to place M.W. in a regular classroom where he was the only IEP student.

**B.  Length of Program**

The Parents also argue the DOE's failure to provide a 12-month program denied M.W. a FAPE. The IHO determined

that the CSE failed to "justify the elimination of a 12-month program" and the administrative record did not support a "reduction in services from a 12-month program to a 10-month program." IHO Decision at 26. The SRO noted that the IHO "did not cite to any evidentiary basis for her determination" and concluded that the determination that "the district's decision not to offer 12-month services denied the student a FAPE [was] not supported by the hearing record." SRO Decision at 23. We defer to that conclusion.[7]

The Parents rely exclusively on the IHO's statement that "the [DOE]'s own witness . . . stated [that] M.W. *required* a 12-month program" to develop their argument. *See* IHO Decision at 26 (citing Tr. at 761) (emphasis added). That reliance is misplaced. The DOE witness was the special education teacher who would have been leading M.W.'s ICT services and who was not part of the IEP team. She said that "being a teacher, . . . more is better, and for a child

---

[7]The IHO's misstatements of the record further justify this deference. The IHO credited the "district's own witness who stated based on her review of the June 10, 2010 IEP [M.W.] required a 12-month program." IHO Decision at 26. The district's witness was the special-education teacher who would have ran M.W.'s ICT services. In response to a question whether M.W. would benefit from a 12-month program she merely stated: "Oh, well, being a teacher, I - more is better, and for a child with such deficits, I think a 12 month would be good for this child. Anything to help him, you know." Tr. 762. She also testified that he would have made progress in a 10-month program. Tr. 770.

with such deficits, I think a 12 month [program] *would be good* for the child." Tr. 761 (emphasis added). That "concession" does not suggest that such a program would be necessary or required to prevent regression. Moreover, the administrative record reveals that regression was not a topic discussed at the IEP meeting. *See* Tr. 638. Mom testified that she was not seeking tuition reimbursement for a 12-month program, only a 10-month program. Tr. at 1109. Accordingly, we are not persuaded that the SRO erred in concluding that the absence of 12-month services did not deny M.W. a FAPE. We also do not agree that the cumulative results of the alleged errors resulted in a FAPE denial. *See R.E.*, 694 F.3d at 190.

Having considered all of the Parents' arguments on appeal, we find them to be without merit. Accordingly, we conclude that the SRO correctly determined that the IEP was substantively adequate and, despite alleged procedural flaws, provided M.W. a FAPE.

## Conclusion

The district court's order of June 15, 2012, granting summary judgment for Defendant-Appellee New York City Department of Education is hereby AFFIRMED.