16-3491-cv
D.B. v. Ithaca City Sch. Dist.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of May, two thousand seventeen.

PRESENT:  REENA RAGGI,
　　　　　 SUSAN L. CARNEY,
　　　　　　　　*Circuit Judges*,
　　　　　 LEWIS A. KAPLAN,
　　　　　　　　*District Judge*.[*]

------------------------------------------------------------------------
D.B., individually and on behalf of L.B., a child with a disability,

　　　　　　　　*Plaintiff-Appellant*,

　　　　　 v.　　　　　　　　　　　　　　　　No. 16-3491-cv

ITHACA CITY SCHOOL DISTRICT,
　　　　　　　　*Defendant-Appellee*.[†]
------------------------------------------------------------------------

APPEARING FOR APPELLANT:　　　EDWARD E. KOPKO, Edward E. Kopko, Lawyer, P.C., Ithaca, New York.

APPEARING FOR APPELLEE:　　　　KATE I. REID, General Counsel (Jonathan B. Fellows, Bond, Schoeneck & King, PLLC,

---

[*] Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

[†] The Clerk of Court is directed to amend the caption as set forth above.

1

Syracuse, New York, *on the brief*), Ithaca City School District, Ithaca, New York.

Appeal from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment entered on September 14, 2016, is AFFIRMED.

Plaintiff D.B., suing on behalf of herself and as the adoptive mother of L.B., a now-eighteen-year-old learning-disabled child, appeals from an award of summary judgment in favor of defendant Ithaca City School District ("School District") on D.B.'s claim for reimbursement of private educational expenses under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* We review an award of summary judgment *de novo*, although, in the IDEA context, we do so mindful that "the responsibility for determining whether a challenged [Individualized Education Plan ("IEP")] will provide a child with [a free and appropriate public education ("FAPE")] rests in the first instance with administrative hearing and review officers." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013) (internal quotation marks omitted). In so doing, we assume the parties' familiarity with the facts and record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

When a parent unilaterally enrolls a disabled child in a private school, we apply the "three-pronged *Burlington/Carter* [t]est to determine eligibility for reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with

2

a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). "At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (internal quotation marks omitted). "Courts then examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefit[s]." *Id.* (internal quotation marks omitted). "Substantive inadequacy automatically entitles the parent[] to reimbursement," *id.*, but procedural violations do so only if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits," *id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d at 139.

1.    Procedural Adequacy

The State Review Officer ("SRO") here found a procedural violation insofar as L.B. failed to receive updated testing in various areas as requested by the School District's Committee on Special Education ("CSE") in August 2012. Nevertheless, the SRO found that "the evidence in the hearing record does not provide any basis upon which to conclude that this procedural violation rose to the level of a failure to offer the student a FAPE for the 2012-13 school year" because the CSE had sufficient information

3

to develop an IEP based on psychological evaluations of L.B. from March and August 2012 and an August 2012 report submitted by a private consultant engaged by D.B. J.A. 416. On appeal, D.B. challenges this conclusion, arguing that information before the CSE when it developed L.B.'s 2012–13 IEP did "not address LB's [non-verbal learning disability ("NVLD")] whatsoever" and reflected "general ignorance of this disability admitted to by [School District] personnel." Appellant's Br. 18–19.

We agree with the SRO that the identified testing failure did not deny L.B. a FAPE because the CSE had access to information in the areas for which further testing was requested and that information consistently identified the same deficiencies and recommended similar corrective techniques, which were included in the IEP.

First, the CSE had before it L.B.'s March 2012 psychological evaluation identifying low perceptual reasoning and low-average math problem-solving scores, which it concluded were "consistent with many characteristics of a[n] [NVLD]." J.A. 12. That evaluation also observed that L.B. suffered from anxiety in new situations and when learning new subjects and that her school performance improved "[o]nce rapport and trust had been established." *Id.* Its resulting recommendations—including "[k]eep[ing] the environment predictable and familiar," "break[ing] larger tasks into smaller chunks with specific deadlines," "allow[ing] [L.B.] to verbalize her thought/problem solving process" and to use a word processor for written responses, *id.* at 13—were tailored to treat the NVLD difficulties identified in the evaluation.

In August 2012, at D.B.'s request, a School District psychologist conducted a new evaluation of L.B. for the upcoming school year. That evaluation identified similar

4

deficiencies in the child's visual perceptual reasoning, low-average scores in math problem solving, difficulty maintaining focus and attending to detail, and task-related anxiety. It recommended, *inter alia*, "re-teaching of new math concepts," "support[ing] [L.B. by] breaking multistep problems and tasks into smaller chunks," use of a computer where possible, and potentially individual counseling. *Id.* at 25–26. D.B. faults this August 2012 evaluation for "conclud[ing] that LB did not have an NVLD." Appellant's Br. 4. While the hearing record shows that the examining psychologist was dubious of the utility of an NVLD classification, this skepticism is of no moment because, as the psychologist testified, "whether or not I believe that the [NVLD] exists in and of itself is irrelevant to [L.B.] and her individual needs," J.A. 237, and the record indicates that those needs were appropriately identified and addressed by the August 2012 IEP.

Finally, the CSE reviewed an August 21, 2012 report submitted by D.B.'s psychological consultant, who concluded, *inter alia*, that L.B. "has a diagnosed non-verbal learning disability," *id.* at 43, which resulted in poorly developed perceptual reasoning skills, difficulty "sustaining attention to written and/or visual material," as well as "depression and anxiety," *id.* at 45. The consultant recommended a "nurturing environment that is structured, supervised, predictable, and consistent," a "[s]mall classroom setting with low teacher/student ratio," "[f]requent one-on-on interactions with teachers who give direct, sequential chunks of information, repeat instructions, . . . frequent breaks to alleviate cognitive fatigue, shorter homework assignments, and more time on tests" and are trained in cuing in on triggers and redirecting thinking patterns, and use of assistive technology. *Id.* at 59.

5

Relying on the totality of these evaluations, the CSE concluded that "L.B.'s education program should be provided at her home school," rather than at the residential private school recommended by D.B. and her consultant.[1] *Id.* at 32. The resulting IEP recognized a need for "additional support in the areas of writing and math," *id.* at 83, identifying L.B.'s poor perceptual reasoning and attention to detail and tendency to give up on challenging tasks. It recommended "direct support within the classroom in order to provide modification of materials and additional explanations and modeling" and "pre-teaching, re-teaching and supplemental instruction provided through resource room support." *Id.* Specifically, it called for a 5:1 student-to-teacher resource room program, daily direct consultant teacher services in math class, and weekly counseling, as well as "[c]lear and specific presentation of information" through, *inter alia*, "[c]hunk[ing] information into manageable pieces," "opportunities to . . . 'talk through' assignment[s] before completing," and a "[f]amiliar and predictable routine."[2] *Id.* at 86–87. The IEP also proposed providing L.B. access to a computer and a portable word processor.

---

[1] The CSE actually met twice in August 2012. It issued the IEP at its first meeting on August 21, the same day on which D.B. submitted her private consultant's report. The CSE then met again on August 28 to consider the report, ultimately deciding to stand by its original IEP.

[2] State regulations define a "resource room program" as "a special education program for a student with a disability registered in either a special class or regular class who is in need of specialized supplementary instruction in an individual or small group setting for a portion of the school day." N.Y. Comp. Codes R. & Regs., tit. 8, § 200.1(rr). Direct consultant teacher services are "specially designed individualized or group instruction provided by a certified special education teacher . . . , to a student with a disability to aid such student to benefit from the student's regular education classes." *Id.* § 200.1(m)(1).

The record thus clearly supports the SRO's conclusion that the March and August 2012 evaluations and the report of D.B.'s psychological consultant provided the CSE with sufficient information—particularly in the areas of social/emotional, attention, and academic/achievement for which updated testing was requested—to generate a 2012–13 IEP that would provide L.B. with a FAPE. In addition, and as the SRO observed, although a further occupational therapy evaluation was not conducted to consider potential benefits of assistive technology, the IEP addressed this need by recommending that L.B. have access to a computer and a word processor to aid in completing written assignments. *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d at 140 (holding that procedural violation "does not render an IEP legally inadequate . . . so long as the IEP adequately identifies [deficiency that would have been subject of additional testing] and implements strategies to address [it]"); *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d at 193 (holding that procedural violation did not deprive child of FAPE where CSE nevertheless reviewed documentation as to child's behaviors and IEP included specific strategies to address behaviors).

Finally, D.B. has failed to suggest, much less show, how updated testing might have altered the CSE's placement recommendation or the IEP. Because the record supports the SRO's conclusion that the CSE's IEP would have provided L.B. with a FAPE within the School District, we defer to its rejection of D.B.'s procedural challenge. Thus, we are not required to consider the appropriateness of the parent's preferred residential placement.

7

2.      Substantive Adequacy

D.B. claims that the School District cannot provide L.B. with a FAPE because its employees lack training and experience handling NVLDs.  The SRO deemed this argument waived, but, even assuming it were not, we conclude that it is defeated by the record.[3]

In assessing substantive adequacy, we are mindful of IDEA's mandate for "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982); *accord Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (holding that "school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" and that "question is whether the IEP is *reasonable*, not whether the court regards it as ideal" (emphasis in original)). IDEA does not require a school district to furnish "every special service necessary to maximize each handicapped child's potential."  *Board of Educ. v. Rowley*, 458 U.S. at 199; *see also Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) (recognizing that IDEA ensures "appropriate education, not one that provides everything that might be thought desirable by loving parents" (internal quotation marks omitted)). We will not "substitute our own notions of sound educational policy for those of the school authorities under review"; rather, we "must defer to the administrative decision

---

[3] The School District argues that D.B.'s contention is premised on information learned at the due process hearing following her rejection of the IEP and, thus, relies on impermissible retrospective testimony.  We need not consider this argument, however, because we reject the substantive challenge even considering the testimony in question.

8

particularly where the state officer's review has been thorough and careful." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d at 138–39 (alteration and internal quotation marks omitted).

After an independent review of the record, we reach the same conclusion as the district court and the SRO: L.B.'s IEP was sufficiently tailored to her needs to ensure meaningful progress. The IEP identified L.B.'s difficulties with non-verbal learning; math problem solving; maintaining attention, particularly to challenging new material; and anxiety. It proposed, as the district court observed, "special education and related services that were specifically designed to address her non-verbal deficits," J.A. 460, including a resource room program involving a low student-to-teacher ratio and led by teachers trained in redirection and cuing methods, daily direct consultant teacher services in math, and individualized counseling.

Indeed, the IEP's recommendations align comfortably with those proffered by D.B.'s own consultant, who was concededly familiar with NVLDs. D.B.'s contention that the consultant "testified that teachers who were ignorant of NVLDs are incapable of providing adequate and appropriate instruction to address the needs of someone suffering from that disability," Appellant's Br. 15, is misleading. The consultant actually vacillated considerably on this point, first stating that the School District's teachers "could certainly implement" the IEP, J.A. 269, before confusingly stating—after concluding that L.B. had an NVLD—that "again, the special education teacher could certainly implement what's here, but . . . it doesn't mean that it's being implemented for a child with [an NVLD]," *id.* at 271.

9

While the foregoing is sufficient to establish the IEP's substantive adequacy, the hearing record here also supports the conclusion that an NVLD is not formally recognized as a psychiatric diagnosis by medical literature or by New York State. Accordingly, a lack of training in that specific designation does not compel a finding that the School District's employees did not understand the nature of L.B.'s disability or the extent of her needs, or that they were unable to provide the accommodations necessary to ensure L.B. a FAPE. Moreover, D.B. never requested that the School District specifically train its teachers in NVLDs, which it could have done if it had deemed it necessary to implement the IEP.

In sum, because the record shows that L.B.'s 2012–13 IEP identified and responded to the child's learning disability, we cannot deem it substantively inadequate. *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d at 140 ("[W]hether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are precisely the type of issues upon which the IDEA requires deference to the expertise of administrative officers."). Insofar as D.B. argues that the School District would have been unable to carry out the IEP, that contention is purely speculative and thus barred by precedent. *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) ("[C]hallenges to a school district's proposed placement school must be evaluated prospectively (i.e., at the time of the parents' placement decision) and cannot be based on mere speculation." (internal quotation marks omitted)).

3.    Conclusion

We have considered D.B.'s remaining arguments and conclude that they are

without merit.  Accordingly, the judgment of the district court is AFFIRMED.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court