**M.S., individually and on behalf of R.R., Plaintiffs–Appellants,**

**v.**

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant–Appellee.**

No. 12–cv–3533 (NG).

United States District Court, E.D. New York.

Nov. 5, 2013.

Gary S. Mayerson, Maria C. McGinley, Tracey Spencer Walsh, Mayerson & Associates, New York, NY, for Plaintiffs–Appellants.

Charles Edward Carey Jr., John Michael Buhta, Lesley Berson Mbaye, New York City Law Department, New York, NY, for Defendant–Appellee.

### OPINION AND ORDER

GERSHON, District Judge:

Plaintiff M.S., individually and on behalf of her son, R.R., sues the New York City Department of Education (the "Department") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* R.R. is an 11–year–old autistic child who attends the Aaron School, a private special education school located in Manhattan. M.S. seeks an order requiring the Department to reimburse her for R.R.'s 2011–2012 private school tuition and pay for related educational services.

The state administrative hearing and appeals process terminated in the Department's favor. After receiving the Department's proposed plan for special education services for R.R. for the 2011–2012 school year, M.S. objected to the appropriateness of the placement and notified the Department of her intention to unilaterally enroll her son at the Aaron School. She then requested an impartial due process hearing under the IDEA to obtain tuition reimbursement. After a lengthy hearing, an Impartial Hearing Officer ("IHO") concluded that the Department's proposed special education plan was deficient and violated R.R.'s right to a free appropriate public education. The IHO ordered the Department to reimburse plaintiff for R.R.'s private school tuition and related services, and the Department appealed. On April 18, 2012, in a detailed opinion, a State Review Officer ("SRO") reversed the IHO's decision, finding that the individualized education program ("IEP") developed for R.R. complied with the IDEA. M.S. then appealed that decision to this court.

The parties have filed cross-motions for summary judgment. For the reasons set forth below, I agree with the State Review Officer that the individualized education program prepared for R.R. for the 2011–2012 school year did not deny R.R. a free appropriate public education and reject the plaintiff's argument that the State Review Officer's decision should be reversed. Accordingly, plaintiff's Motion for Summary Judgment is DENIED, and the Department's Motion is GRANTED.

## BACKGROUND

### I. STATUTORY FRAMEWORK

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education ... designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B); *see also Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 239, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009). The IDEA provides that "states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.' " *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 107 (2d Cir.2007) (quoting 20 U.S.C. § 1412(a)(1)(A)).

To implement this mandate, "a school district must create an individualized education program" for each child with disabilities. *R.E. v. N.Y.C. Dep't of Educ.,* 694 F.3d 167, 175 (2d Cir.2012) (citing 20 U.S.C. § 1414(d)). An IEP is "a written statement that sets out the child's present

educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir.2006) (internal quotation marks omitted). The IEP is to be developed collaboratively by the child's parents, teachers (including at least one special education teacher), and representatives of the local education authority. *R.E.*, 694 F.3d at 175; *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).

Under the IDEA, an individualized education program must be "tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (internal quotation marks and citation omitted). A child's IEP, however, does not need to "furnish . . . every special service necessary to maximize each handicapped child's potential." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir.2003) (quoting *Rowley*, 458 U.S. at 199, 102 S.Ct. 3034) (brackets and internal quotation marks omitted). "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir.2005) (internal quotation marks omitted). In other words, while an individualized education program does not need to "provide[ ] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted), it must provide

"meaningful" access to an education, *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034, and confer "some educational benefit" upon the child for whom it is designed, *id.* at 200, 102 S.Ct. 3034.

If a child's parents believe that the IEP fails to provide the child with a free appropriate public education, the parents may, at their own financial risk, "remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *Cerra*, 427 F.3d at 192 (internal quotation marks omitted). To obtain tuition reimbursement in New York, a parent must first challenge the adequacy of the individualized education program "in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an IHO appointed by the local board of education, *see* N.Y. Educ. Law § 4404(1)." *Grim*, 346 F.3d at 379. At this hearing, "the school district has the burden of demonstrating the appropriateness of its proposed IEP," *id.*, but "a parent . . . seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. Law § 4404(1)(c). The decision of the Impartial Hearing Officer may be appealed to a State Review Officer, who is an officer of the New York State Department of Education. *Grim*, 346 F.3d at 379–80; N.Y. Educ. Law § 4404(2).

Any "party aggrieved" by the findings of the State Review Officer may, in turn, bring a civil action in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). Although New York law places the burdens of production and persuasion on the school district in state administrative proceedings, when parents bring a subsequent federal action challenging a State Review Officer's decision in favor of the school district, "the courts are bound to exhibit deference to that decision." *M.H. v.*

*N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 n. 3 (2d Cir.2012). Accordingly, as plaintiff concedes (*see* Pl.'s Reply Br. at 4), "the burden of demonstrating that the [State Review Officer] erred is properly understood to fall on the plaintiffs." *M.H.*, 685 F.3d at 225 n. 3. In determining whether the State Review Officer's decision was "supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise," which is not the case here. *Id.*[1] As a result, "it 'is incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal.'" *M.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 n. 1 (2d Cir.2013) (quoting *W.T. v. Bd. of Educ. of Sch. Dist. of N.Y.*, 716 F.Supp.2d 270, 287 (S.D.N.Y.2010)).

## II. FACTUAL BACKGROUND

As is typical in IDEA cases, the court's inquiry is "fact-intensive," and it is therefore "necessary to set forth in some detail the facts" presented in the record. *R.E.*, 694 F.3d at 175. The following facts are undisputed unless otherwise noted.

### A. R.R.'s Background and Education

R.R., the son of M.S., is an eleven-year-old boy with autism. His classification as a child with autism in need of specialized education is not in dispute. R.R. also has been diagnosed with Attention Deficit Hyperactivity Disorder, has difficulty filtering out other stimuli, and takes a long time to initiate and complete any given task. Without prompts, R.R. can attend to lessons only for short periods of time. R.R. also suffers from significant and pervasive developmental delays, including deficits with executive functioning, language processing, and pragmatic and expressive language.

During the 2010–2011 school year, R.R. attended a 10–month program at the Aaron School, where he was placed in an 11–student classroom with one teacher and one teacher's assistant. The Aaron School is a private special education facility in Manhattan for children who cannot function in a mainstream environment; it uses a multi-sensory program to educate children who have speech, focus, and other deficits, including children with autism. In addition to classroom instruction using a language-based curriculum, R.R. received group speech therapy two times per week, group occupational therapy two times per week, and group social skills instruction once per week.

### B. The Individualized Educational Program and Placement Offer for the 2011–2012 School Year

On February 3, 2011, the Department convened a meeting of the local Committee on Special Education (the "IEP team") to formulate R.R.'s individualized education

---

1. Following the Supreme Court's decision in *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005)—which held, as a matter of federal law, that the burden in an administrative proceeding falls on the plaintiff to show that an IEP was inappropriate—New York has attempted to reallocate the burden to the school district. *See* N.Y. Educ. Law § 4404(1)(c). Whether this burden-shifting is permissible or whether it is preempted by the IDEA is a question expressly left open in *Schaffer, see* 546 U.S. at 62, 126 S.Ct. 528, and not yet decided by the Second Circuit. There is no reason to reach this question here. Moreover, despite plaintiff's arguments to the contrary, the State Review Officer in this case in fact placed the burden of demonstrating the adequacy of the IEP on the Department. (*See, e.g.,* SRO Dec. at 17 (concluding that the Department had *"sustained its burden* to establish that it offered the student a [free appropriate public education] ... for the 2011–2012 school year") (emphasis added).)

program for the 2011–2012 school year. The IEP team comprised: M.S., the mother; a Department representative, who was also a special education teacher; a school psychologist; a bilingual social worker; and a teacher from the Aaron School. The Aaron School's speech therapist was not available at the IEP meeting, and no other speech therapist attended the meeting.

Because R.R. had attended the Aaron School for the prior academic year, the IEP relied primarily on reports it received from that school. Among other materials, the IEP team had access to and reviewed: the 2010–2011 Aaron School Fall Report; the Aaron School Speech Language Therapy, Occupational Therapy, and Counseling Plans; the Speech Zone speech therapy progress note; the Integrated Development Center speech and language report; and a classroom observation. The IEP team also had access to a March 10, 2010 psycho-educational evaluation of R.R., which indicated that he had a full scale I.Q. score of 66.

R.R.'s teacher from the Aaron School provided the rest of the IEP team with her assessment of R.R.'s current levels of performance. She estimated that he was reading and performing math at a first grade level, but had moderate to severely delayed comprehension skills. The teacher and R.R.'s mother both provided the team with information about R.R.'s social and emotional development. His teacher reported that R.R.'s behavior was not presently a problem and that she did not think he required a Behavior Intervention Plan. For her part, R.R.'s mother expressed concern about changing R.R.'s current program and stated that R.R. had a continued need for the level of support services, including speech and occupational therapy, that he was receiving under the IHO's pendency order.[2]

Prior to receiving the results of the IEP meeting, M.S. signed an enrollment contract with the Aaron School for the upcoming school year and paid a $6,000 nonrefundable deposit. Annual tuition at the Aaron School for a 10–month program was $47,950. M.S. also enrolled R.R. in a 4–week summer program with an additional cost of $6,300.

On June 7, 2011, the Department sent M.S. a letter summarizing R.R.'s recommended special education program and related support services for the school year starting July 1, 2011. Under the IEP, R.R. would be placed in a 12–month program in a specialized public school with a class comprised of twelve students, one special education teacher, and one classroom paraprofessional (known as a "12:1 + 1 class"). The IEP set forth 18 annual goals and over 70 corresponding short-term objectives for R.R., many of which were taken directly from educational plans from the Aaron School. Even though R.R.'s private school teacher did not feel that his behavior was serious enough to warrant a Behavior Intervention Plan, the IEP included a behavioral plan containing strategies to decrease various behaviors (*e.g.,* difficulties following directions and

2. The "pendency" provisions of the IDEA and New York law establish that an unappealed pendency order acts as an automatic injunction that requires the school district to provide certain educational services pending final disposition of a challenge to the student's IEP. *See generally Arlington Cent. School Dist. v. L.P.,* 421 F.Supp.2d 692, 696–97 (S.D.N.Y. 2006). Following a July 13, 2011 hearing regarding the services to be provided to R.R. during the pendency of these proceedings, the IHO issued an order requiring the Department to provide R.R. each week with ten speech and language therapy sessions, six occupational therapy sessions, two physical therapy sessions, two counseling sessions, and fifteen hours of Applied Behavioral Analysis therapy. (*See* IHO Dec. at 3.)

unfocused behavior) that interfered with R.R.'s learning process.

The IEP provided for three 30–minute occupational therapy sessions per week in a one-on-one setting and two 30–minute physical therapy sessions per week in a one-on-one setting. It also provided for three individual 30–minute speech and language therapy sessions per week and two weekly sessions in a group of two students. Under the IEP, R.R. would thus receive more hours of these related services at his public school placement than he had been receiving directly from the Aaron School.

On June 7, 2011, the Department also sent M.S. a final notice of recommendation informing her of R.R.'s placement at the specialized public school denominated P.S. 373, a smaller school located within the building of P.S. 58. The Department unilaterally selected this school site, without affording M.S. an opportunity to participate in the school placement decision. After receiving the IEP and placement decision, M.S. promptly contacted the school site and arranged for a site visit on June 13, 2011.

After visiting the proposed public school on June 13, 2011, M.S. objected to R.R.'s placement at P.S. 373. In a June 15, 2011 letter, M.S. asserted that the recommended placement was not appropriate for R.R. because there were only two 12–student special education classes at P.S. 373; the students in these two classes "had vastly different needs and functioning levels" than her son; and "[n]o one could identify what teaching methods and/or curriculum [were] used" in the classes. (Decision of the State Review Officer, No. 12–035, dated April 18, 2012 ("SRO Dec"), at 3.) She notified the Department that, in the absence of an appropriate placement, she intended to unilaterally enroll R.R. at

the Aaron School for the 2011–2012 school year and to seek reimbursement for the costs of R.R.'s tuition and additional support services. (*Id.*)

## C. The Impartial Due Process Proceedings

M.S. filed a due process complaint on June 30, 2011, requesting an impartial hearing.[3] The complaint alleged that the IEP was both procedurally and substantively unreasonable, thereby depriving R.R. of a free appropriate public education. Among the 77 violations asserted by M.S., M.S. alleged that: (1) the Department failed to develop a Functional Behavioral Assessment; (2) the Behavior Intervention Plan was insufficient; (3) the IEP did not include a transition plan; and (4) the recommended placement at P.S. 373 was inappropriate. M.S. requested reimbursement for R.R.'s tuition at the Aaron School, as well as reimbursement for related support services including six 30–minute occupational therapy sessions per week, as well as five 30–minute and five 45–minute speech and language therapy sessions per week.

In response to M.S.'s complaint, an Impartial Hearing Officer conducted a due process hearing to consider whether the IEP offered R.R. an appropriate program. The hearing on the merits lasted five non-contiguous days between September 26, 2011 and December 6, 2011. (IHO's Findings of Fact and Decision, dated January 10, 2012 ("IHO Dec."), at 3.) Eleven witnesses—including M.S., R.R.'s private school teacher, a school psychologist, a social worker, a special education teacher from P.S. 373, and the heads of both P.S. 373 and the Aaron School—testified at the hearing, and over fifty documents were

---

3. M.S. filed a substantially similar amended complaint on September 14, 2011, which add-

ed one alleged violation to the June 30, 2011 complaint.

admitted into evidence. (*Id.* at 1–2 & 22–24.) Based on this record, the IHO found that the Department had failed to offer R.R. a free appropriate public education. (*Id.* at 17.) Although the IHO summarized the testimony and record evidence at some length, the decision devoted only a single page to an analysis of the appropriateness of the individualized education program offered to the student. (*Id.*) The IHO concluded that the IEP accurately described R.R.'s needs; that the goals set forth in the IEP were appropriate to address those needs; that the recommended 12–month program in a specialized public school with a 12.1 + 1 student-teacher-paraprofessional ratio was an appropriate classroom setting for R.R.; that the Behavior Intervention Plan prepared for R.R. was both appropriate and consistent with the level of support provided at the Aaron School; and that the recommended levels of occupational therapy and counseling specified in the IEP were appropriate. (*Id.*) Nevertheless, the IHO held that the IEP was deficient in four respects: (1) the IEP failed to provide for transitional support services to facilitate R.R.'s adjustment to the new school as required by state regulations; (2) the IEP failed to provide for parental counseling and training as required by state regulations; (3) the recommended level of speech and language therapy sessions set forth in the IEP was insufficient to meet R.R.'s "intensive language needs"; and (4) R.R. would not "derive an education benefit" from placement at P.S. 373, because the teacher there had limited experience with autistic children and was not familiar with a "sen-

sory diet,"[4] and because R.R. would be placed in a classroom with intellectually disabled students. (*Id.*)

After finding the Department's recommended program deficient, the IHO concluded that M.S. had established that the Aaron School, supplemented by additional occupational and speech therapy services, was an appropriate alternative to meet R.R.'s needs and that the equities favored tuition reimbursement. (*Id.* at 18–20.) As a result, the IHO ordered the Department to pay the costs of R.R.'s tuition at the Aaron School from September 2011 through June 2012; provide vouchers for R.R. to receive two weekly 30–minute sessions of occupational therapy and four weekly 45–minute sessions of speech therapy from outside service providers; and provide vouchers for any services that R.R. had not received while the July 13, 2011 pendency order had been in effect. (*Id.* at 20–21).

### D. The Department's Appeal to a State Review Officer

The Department appealed the IHO's decision, contending that the IHO erred in concluding that it had failed to show that it had offered R.R. a free appropriate public education for the 2011–2012 school year. In particular, the Department argued that the IDEA does not require transitional support services when a student moves from one school district to another; parent counseling/training, although not set forth in the IEP, was in fact available at P.S. 373; R.R.'s IEP provided for appropriate levels of speech and language therapy to address his needs; and the IHO erred in

---

**4.** A "sensory diet" provides students with movement and sensory input activities—such as "massage, use of a trampoline, use of equipment in the sensory gym, such as swings, large pillows, comfortable access to chairs, squish balls for [use] while [the student] is working or trying to attend to stories or academics"—that enable the students to maintain their bodies in control and pay attention to "what the teachers are trying to offer them academically and socially." *See A.D. v. Bd. of Educ. of City School Dist. of City of New York*, 690 F.Supp.2d 193, 211 (S.D.N.Y.2010).

concluding that R.R. would not have been appropriately placed at the recommended school. (SRO Dec., at 5–6.) The Department also appealed the IHO's findings that the Aaron School was an appropriate alternative placement and that equitable considerations did not preclude an award of tuition reimbursement. (*Id.*) M.S. did not cross-appeal any of the IHO's findings in the Department's favor. (*Id.* at 6 n. 11.)

In an April 18, 2012 decision, the State Review Officer reversed the portions of the IHO decision that had found that the Department had failed to offer R.R. an appropriate placement and had directed the Department to reimburse the costs of R.R.'s Aaron School tuition and issue vouchers to support the Aaron School placement. (*Id.* at 17.) Because the State Review Officer concluded that the Department had "sustained its burden to establish that it offered the student a [free appropriate public education] . . . for the 2011–2012 school year," the State Review Officer did not reach the issue of whether the Aaron School was an appropriate unilateral placement. (*Id.*)

On July 17, 2012, M.S. timely brought a civil action in this court, seeking modified *de novo* review and reversal of the State Review Officer's April 18, 2012 decision, as well as reinstatement of the IHO's January 10, 2012 decision (with certain modifications). Plaintiff and the Department then cross-moved for summary judgment.

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

#### A. Standard of Review

■ In an action appealing a state administrative decision under the IDEA, the parties typically submit their papers in the form of cross-motions for summary judgment. *M.H.*, 685 F.3d at 225. However, "[t]hough the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005) (quotation marks omitted). "As such, a motion for summary judgment in IDEA cases often triggers more than an inquiry into possible disputed issues of fact." *Id.* Rather, the court "must engage in an independent review of the administrative record," along with any additional evidence presented by the parties, and must determine, "on a preponderance of the evidence," whether the record demonstrates compliance with the IDEA. *Gagliardo*, 489 F.3d at 112–13; *see also Rowley*, 458 U.S. at 205, 102 S.Ct. 3034.

■ As the Second Circuit has repeatedly emphasized, however, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *R.E.*, 694 F.3d at 189 (quoting *Gagliardo*, 489 F.3d at 112–13). The reviewing court "must give 'due weight' to the state proceedings, mindful that we lack 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" *Id.* "It is not for the federal court to 'ch[oose] between the views of conflicting experts' on such questions," *id.* (quoting *Grim*, 346 F.3d at 383), or to "substitute their own notions of sound educational policy for those of the school authorities which they review," *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. The standard for reviewing the state proceedings thus "requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless[ ] falls well short of complete *de novo* review." *M.H.*, 685 F.3d at 244 (internal quotation marks omitted).

The precise weight to be given to a state administrative decision varies based on the

type of determination at issue, as well as the persuasiveness of the opinion. The court should consider the factors that "normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* However, the court's evaluation of the administrative decision "must also be colored by an acute awareness of" the administrative judges' greater institutional competence in matters of educational policy. *Id.* (explaining, by way of illustration, that "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures"); *see also Gagliardo*, 489 F.3d at 114 (holding that courts should not disturb decisions of state administrative officers that are "reasoned and supported by the record"). Deference is particularly warranted where, as here, the court's review is based solely on the administrative record, as opposed to where the court

considers additional evidence that was not available to the state agency. *M.H.*, 685 F.3d at 244.[5]

In the present case, two different administrative officers, the Impartial Hearing Officer and the State Review Officer, reached opposite conclusions as to the adequacy of the individualized education program offered to R.R. "Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence." *M.H.*, 685 F.3d at 246. Instead, "courts must defer to the reasoned conclusions of the SRO as the final state administrative determination," unless the court "appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference," in which case the court may consider the IHO's analysis rather than "rely exclusively on its own less informed educational judgment." *Id.* at 244.

## B. Standard for Evaluating Compliance with the IDEA

To determine whether a school district offered a free appropriate public education

---

5. Plaintiff's argument that she should be allowed to supplement the record with additional discovery in support of her claim that the Department failed to offer R.R. a free appropriate public education is without merit. The only supplemental discovery that plaintiff actually sought in connection with this action was a single, one-hour deposition of a replacement teacher who presumably would have worked with R.R. from September 2011 through June 2012. According to plaintiff, the deposition would have concerned how the replacement teacher would have implemented the proposed IEP plan. But this discovery could not have concerned the placement and services "reasonably known" to M.S. at the time of the placement decision, because the replacement teacher only began teaching at the recommended school several weeks *after* plaintiff rejected, on June 15, 2011, the individualized education program offered to R.R. *See R.E.*, 694 F.3d at 187 ("In determining

the adequacy of an IEP, both parties are limited to discussing the placement and services *specified in the written plan and therefore reasonably known to the parties at the time of the placement decision.*") (emphasis added). Moreover, the evidence sought by plaintiff was unduly speculative. For example, had R.R. enrolled at P.S. 373, it is entirely possible that a different special education teacher would have been assigned to teach the recommended 12:1 + 1 class. Indeed, nowhere in the IEP did the Department guarantee that this particular teacher would be assigned to R.R.'s classroom. Accordingly, the only additional discovery actually identified by plaintiff could have no bearing on this court's determination whether the Department offered R.R. a free appropriate public education. (*See* Apr. 23, 2013 Order, Dkt. 24 (affirming Jan. 30, 2013 Order of Magistrate Judge Levy denying plaintiff's discovery request).)

to a child with disabilities, as required by the IDEA, the district court engages in a two-part inquiry. *R.E.*, 694 F.3d at 189–90. The court first asks "whether the state has complied with the procedures set forth in the IDEA." *Id.* (internal quotation marks omitted). The IDEA requires, *inter alia*, that parents of a child with disabilities have an opportunity to examine all records relating to the child, participate in meetings regarding the development of an individualized education program, and obtain an independent evaluation of the child. *See* 20 U.S.C. § 1415(b)(1); *Cerra*, 427 F.3d at 192. Because the "IDEA incorporates some but not all state law concerning special education," *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 734 (2d Cir.2007), the court must also consider whether the development of the IEP complied with relevant state law. *T.L. v. New York City Department of Educ.*, 938 F.Supp.2d 417, 433 (E.D.N.Y.2013); *A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 & n. 1 (2d Cir. 2009).

This procedural inquiry "is no mere formality," *Walczak*, 142 F.3d at 129, since "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP," *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. However, while school districts are required to comply with all federal and state procedures, "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim*, 346 F.3d at 381. A procedural violation will result in the denial of an appropriate public education only if the procedural inadequacy "impeded the child's right to a free appropriate public education," "impeded the parents' opportunity to participate in the decision-making process," or "caused a deprivation of educational benefits." 20 U.S.C.

§ 1415(f)(3)(E)(ii); *see also R.E.*, 694 F.3d at 190.

Second, the court assesses the substantive adequacy of the IEP by determining "whether the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *M.H.*, 685 F.3d at 242 (internal quotation marks omitted). A "school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student an opportunity greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). Accordingly, the court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan," but, as explained above, deference to the state administrative agencies, which have special expertise in making judgments concerning student progress, "is particularly important when assessing an IEP's substantive adequacy." *Id.* (internal quotation marks omitted).

Only if it finds that an individualized educational program is deficient, either procedurally or substantively, does the court determine "whether the private schooling obtained by the parents is appropriate to the child's needs." *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir.2009) (per curiam).

## II. ANALYSIS

### A. Procedural Compliance with the IDEA

M.S. raises several procedural challenges to R.R.'s individualized educational program, but none of the asserted procedural violations, whether considered individually or cumulatively, is sufficiently ser-

ious as to deny R.R. a free appropriate public education, as required by 20 U.S.C. § 1415(f)(3)(E)(ii).

### 1. *Failure to conduct a Functional Behavioral Assessment*

Plaintiff first argues that R.R.'s individualized education program failed to include a functional behavioral assessment ("FBA") and that this deficiency denied R.R. a free appropriate public education. The Department concedes that the IEP team did not conduct an FBA before adopting R.R.'s individualized education program, but objects that plaintiff may not assert any claims regarding the lack of an FBA, because she did not raise this issue before the State Review Officer.

 Because M.S. raised the IEP team's failure to conduct an FBA in her due process complaint, and M.S. prevailed before the IHO, I find that this claim is preserved for review. As the prevailing party before the IHO, M.S. was not "aggrieved" by the IHO's failure to reach additional arguments in her favor, and therefore had no ability or motive to appeal that decision. *See* 8 N.Y.C.R.R. § 200.5(k)(1) (limiting appeals to an State Review Officer to "[a]ny party aggrieved by the findings of fact and the decisions of an impartial hearing"). The failure by a prevailing party "to cross-appeal an issue not addressed by the IHO one way or the other does not and should not prevent that issue from being preserved for review." *FB v. New York City Dep't of Educ.*, 923 F.Supp.2d 570, 588 (S.D.N.Y.2013); *see also J.F. v. New York City Dep't of Educ.*, No. 12–cv–2184, 2012 WL 5984915, at *9 (S.D.N.Y. Nov. 27, 2012) (holding that "a party's failure to cross-appeal an issue never reached by the IHO does not necessarily constitute a waiver of its rights to pursue that issue"); *but see C.F. v. N.Y.C. Dep't of Educ.*, No. 11–cv–0157, 2011 WL 5130101, at *12 (S.D.N.Y. Oct. 28, 2011)

("Any aspects of the IHO's decision that were not appealed to the [State Review Officer] are now final and binding on the parties.")

Turning to the substance of plaintiff's argument, in developing an individualized education program for "a child whose behavior impedes the child's learning," the IDEA requires a school district to "*consider* the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added). A New York State regulation requires a school district to conduct a functional behavioral assessment as part of its initial evaluation "for a student whose behavior impedes his or her learning or that of others, *as necessary* to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. § 200.4(b)(1)(v) (emphasis added).

 Thus, under both the IDEA and New York State law, the decision of whether a student exhibits problematic behavioral issues sufficient to require a functional behavioral assessment is left to the discretion of school officials. A school district is required to conduct an FBA only where it determines that the behavior at issue is sufficiently serious as to "impede" the student's learning and where such an assessment is "necessary" to ascertain the causes of the problematic behavior.

 Moreover, even where required, the "failure to conduct an FBA ... does not rise to the level of a denial of a [free appropriate public education] if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190; *see A.C.*, 553 F.3d at 172 (failure to perform a FBA did not render IEP legally inadequate in light of strategies in the IEP to address child's behav-

ior); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir.2009) ("substantial evidence in the record" of ways to address problematic behaviors provided a basis for State Review Officer to conclude that the failure to conduct a functional behavioral assessment did not render the IEP inappropriate).

The purpose of conducting an FBA is to ascertain "why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 N.Y.C.R.R. § 200.1(r). In R.R.'s case, an FBA would have considered, *inter alia,* his problems with distractibility and attending to tasks, and would have formulated strategies for addressing these issues.

▆▆▆ Weighing the record evidence against these standards, I find by a preponderance of the evidence that the failure to conduct a functional behavioral assessment did not deny R.R. a free appropriate public education. First, while there is some evidence that R.R. displayed behaviors that impacted his ability to learn, the record also reflects that his private school teacher reported to the IEP team that R.R.'s behavior was not presently a problem and that she did not believe he needed a behavioral intervention plan. (*See, e.g.,* IHO Dec., at 5.) This assessment suggests that R.R.'s behavior did not seriously "impede" his or other students' instruction so as to require a functional behavioral assessment.

In addition, as the State Review Officer noted, R.R.'s education program included a Behavior Intervention Plan that specifically addressed his behavioral issues. (SRO Dec., at 7–8.) This plan described R.R.'s difficulty with following teacher directions, off-task and out-of-seat behavior, and inattentiveness during classroom instruction, and included strategies for managing these behaviors. (*See* IEP at 22.) Although

plaintiff argues that these recommendations "failed to meet [R.R.'s] unique needs" (Pl.'s Br. at 17), nowhere does plaintiff explain which of R.R.'s needs are not addressed in the IEP. *See M.W.,* 725 F.3d at 140 ("Where the IEP actually includes a BIP, parents should at least suggest how the lack of an FBA resulted in the BIP's inadequacy or prevented meaningful decision-making.") Plaintiff offers no evidence, for example, that the BIP was based on an "obsolete assessment" of R.R.'s behavioral problems or that the "recommended behavior-modification strategies failed to accommodate the frequency or intensity of the student's behavioral problems." *See id.*

Moreover, plaintiff waived any argument regarding the sufficiency of the behavioral plan itself by failing to cross-appeal the IHO's finding that "the BIP prepared by the [IEP team] is appropriate, and consistent with the level of support provided in [R.R.'s] current setting." (IHO Dec. at 17.) Unlike issues never reached by the IHO, the IHO's decision on an issue actually addressed and decided by the IHO "is 'binding' upon the parties absent an appeal to the SRO." *See, e.g., D.N. v. New York City Dep't of Educ.,* 905 F.Supp.2d 582, 588 (S.D.N.Y.2012). Under these circumstances, the failure to perform a formal functional behavioral assessment of R.R. did not render the IEP legally inadequate.

### 2. *Failure to include parental counseling and training in the IEP*

▆▆▆ Next, plaintiff contends that the State Review Officer erred in overturning the IHO's finding that the IEP denied R.R. a free appropriate public education by failing to provide for parental counseling and training. Under New York law, an IEP must "provide for parent counseling and training for the parents of autistic children" in order to help the parents un-

derstand the needs of their child and support the implementation of the child's IEP with appropriate follow-up intervention activities at home. *See R.E.*, 694 F.3d at 191 (citing 8 N.Y.C.R.R. § 200.13(d) & (kk)); *M.W.*, 725 F.3d at 141. Without any analysis whatsoever, the IHO determined that the failure to provide for parental counseling in the IEP, as required by New York law, rendered the IEP inadequate.

■ In reversing that determination, the State Review Officer improperly relied on retrospective testimony by the public school teacher, who testified at the impartial hearing that parent training and counseling were in fact available at P.S. 373 through a parent coordinator. The State Review Officer relied on this testimony in concluding that the Department's failure to confirm the availability of these services in the IEP would have resulted in no actual harm to R.R. (*See* SRO Dec. at 9.) The Second Circuit has held, however, "that retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered" in a challenge to the appropriateness of a student's placement. *R.E.*, 694 F.3d at 186. In other words, "[a] school district cannot rehabilitate a deficient IEP after the fact by relying on testimony that 'effectively amends or fixes' a deficient IEP 'by showing that the child would, in practice, have received the missing services.'" *K.L. v. New York City Dep't of Educ.*, 530 Fed.Appx. 81, 85 (2d Cir.2013) (quoting *R.E.*, 694 F.3d at 186). The restriction on the use of retrospective evidence "is rooted in the principle that parents must be able to decide rationally whether to accept a proffered public school placement or to send their child, at the risk of non-reimbursement, to private school. In most cases, parents make this difficult decision on the basis of the IEP." *K.L.*, 530 Fed.Appx. at 85. Accordingly,

whether the student was offered a free appropriate public education must be based on the IEP itself, and the State Review Officer should not have relied on hearing testimony concerning counseling services that would have been offered at the placement school but that were not set forth in the IEP. *See R.E.*, 694 F.3d at 195 (holding that the "evaluation must focus on the written plan offered to the parents," and not speculation concerning what would or would not have been offered at the placement).

The question before this court, however, "is not whether the SRO relied on impermissible retrospective evidence," but whether there is "sufficient *permissible* evidence" supporting a finding that the IEP offered R.R. a reasonable prospect of achieving educational benefits and did not impede M.S.'s meaningful participation in the IEP process. *See K.L.*, 530 Fed.Appx. at 85.

■ In the case of parent counseling, the "failure to provide counseling ordinarily does not result in a [denial of a free appropriate public education] or warrant tuition reimbursement." *M.W.*, 725 F.3d at 142; *see also R.E.*, 694 F.3d at 191 (same). This is particularly the case where, as in New York State, parents are entitled to receive counseling and training irrespective of whether these services are set forth in the IEP. "[B]ecause school districts are required by [New York law] to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service." *R.E.*, 694 F.3d at 191; *see also M.W.*, 725 F.3d at 142. Since M.S. had available to her an alternative means of ensuring that she would receive parental counseling, and since plaintiff has made no showing that the lack of such training would result in

any deprivation, I find by a preponderance of the evidence that the omission of a specific provision for parental counseling from the IEP, without more, did not deprive R.R. of a free appropriate public education.

### 3. *Failure to include transitional support services in the IEP*

██ Plaintiff also argues that the failure to include transitional support services in the IEP denied R.R. a free appropriate public education.[6] It is undisputed that no such services were set forth in the IEP, but plaintiff's contention that the IDEA requires school districts to provide transitional support services *directly to students* to facilitate their adjustment to public school is misplaced. New York law requires that transitional support services be included in an autistic child's IEP when the "student has been placed in programs containing students with other disabilities, or in a regular class placement." 8 N.Y.C.R.R. § 200.13(a)(6). The state regulation specifies, however, that these temporary support services are to be imparted by an experienced autism teacher to "*a regular or special education teacher*" in order to aid that teacher in addressing the autistic child's needs. *Id.* § 200.1[ddd] (emphasis added).

Here, had R.R. attended P.S. 373, he would have been placed in a program containing students with other disabilities, which on its face would trigger the Department's obligation to include transitional support services in the IEP. (*See* SRO Dec. at 9 n. 13; 8 N.Y.C.R.R. § 200.13(a)(6).) But, since such services are required only where the student is "transferring to a regular program *or to a program or service in a less restrictive environment,*" 8 N.Y.C.R.R. § 200.1[ddd] (emphasis added), whether the IEP needed to include transitional support services turns on whether the proposed 12:1 + 1 special public school class at P.S. 373 was a less restrictive environment than R.R.'s 11:1 + 1 special class at the Aaron School. As noted by the State Review Officer, the record on this question is ambiguous. (*See* SRO Dec. at 9 n. 13.) In fact, it is not even clear whether R.R.'s Aaron School class was limited to autistic children or included students with other disabilities. Faced with this ambiguity, and cognizant that the burden of persuasion in this appeal "is properly understood to fall on the plaintiffs," *M.H.*, 685 F.3d at 225 n. 3, I find that plaintiff has not shown, by a preponderance of the evidence, that the State Review Officer erred in determining that the failure to specify transitional support services in the IEP did not deprive R.R. of a free appropriate public education.

Even assuming that the IEP was required to include transitional support services, and disregarding retrospective evidence regarding the transitional services that the Department claims it would have provided had R.R. attended P.S. 373,[7] the

---

**6.** Although plaintiff raises this issue for the first time in her reply brief, the Department had an opportunity to and did respond in its cross-reply, and therefore I will address it.

**7.** Testimony during the impartial hearing revealed that the school's autism coach, the assistant principal, and the counselor—who were all well versed in dealing with students with autism—would have provided transitional assistance to the classroom teacher. (*See* SRO Dec. at 10–11). From the record, however, it does not appear that it was known or "reasonably known" to M.S., at the time she made the decision to enroll R.R. at the Aaron School for the 2011–2012 school year, that these staff members would assist the classroom teacher in addressing R.R.'s special education needs as a student with autism. *See R.E.*, 694 F.3d at 187 (limiting consideration to "placement and services ... reasonably known to the parties at the time of the placement decision"). M.S. visited the recom-

State Review Officer still found that the IEP was an appropriate placement. (SRO Dec., at 11.) The State Review Officer observed that the IEP, viewed as a whole, provided an "array of services and supports to enable [R.R.] to receive educational benefits." (*Id.*) In light of the IEP's comprehensive provisions, the State Review Officer concluded that "the hearing record does not support the conclusion that the student would fail to make progress because transitional support services for the special education teacher in the special school were not listed on the IEP." (*Id.*) Giving due deference to the State Review Officer, I agree with the determination that the failure to identify transitional services in the IEP did not render it inappropriate.

4. *The Department's unilateral selection of the recommended placement school*

Pursuant to its general practice, *see* R.E., 694 F.3d at 191, the Department selected the recommended school without any input from M.S., who only received notice of the placement decision on June 7, 2011. Plaintiff contends that the Department's failure to identify the specific school at which R.R. would be placed during the IEP meeting, or consult with her regarding the placement decision, deprived her of the right to meaningful participation in the development of R.R.'s individualized education program. This argument is mis-

placed. The IDEA requires that an IEP provide general information about the program to be offered to the student, including information about staffing ratios and related services, but does not require the district to specify the specific school where those services will be delivered. *R.E.*, 694 F.3d at 191.

Although the IDEA requires that parents be included in "any group that makes decisions on the educational placement of their child," 20 U.S.C. § 1414(e), "the term 'educational placement' refers only to the general type of educational program in which a child is placed." *T.Y.*, 584 F.3d at 419 (quoting *Concerned Parents v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir.1980) (internal quotation marks omitted)). Accordingly, "[t]he Department may select the specific school without the advice of the parents, so long as it conforms to the program offered in the IEP." *RE.*, 694 F.3d at 191–92; *accord T.Y.*, 584 F.3d at 419.

The Supreme Court's decision in *Florence County School District Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), is not to the contrary. Plaintiff latches onto a single sentence in *Carter* describing Congress's intention that the IDEA's promise of a free appropriate public education "normally be met by an IEP's provision for education in the regular public schools or in private schools

---

mended placement school before rejecting the placement, and on this visit she reasonably could have inquired into the qualifications and services provided by the school's autism coach, assistant principal, and counselor. Even so, the IEP provided her with no assurances that these staff members would in fact assist the classroom teacher in addressing R.R.'s educational needs. Although testimony that "explains or justifies the services listed in the written IEP" is permissible, "testimony that materially alters the written plan is not permitted," *id.* at 186, and the Department

concedes that transitional support services were not specified in the IEP. To the extent the Behavior Intervention Plan, which is part of the IEP, provides for certain assistance to the classroom teacher—*e.g.*, that "staff members who provide services for [R.R.]" will work in collaboration with his teachers to "assist in implementing" the BIP (*see* IEP at 22)—that provision is directed at addressing behaviors that interfere with R.R.'s learning and cannot fairly be read to provide for more general support to the classroom teacher in addressing R.R.'s educational needs.

chosen jointly by school officials and parents." *Id.* at 12, 114 S.Ct. 361. Not only is this statement dicta, but it is best read as suggesting only that, where a school district determines that it cannot provide an appropriate placement in a public school, a state-approved private school would generally be "chosen jointly by school officials and parents" as an alternative to the public school placement. *See id.* at 12–13, 114 S.Ct. 361. Moreover, the Second Circuit's decisions in *R.E.* and *T.Y.*, which were both decided after the Supreme Court's *Carter* decision, squarely reject plaintiff's contention that parents must be consulted regarding the school placement decision. *See R.E.*, 694 F.3d at 191–92, *cert. denied,* —— U.S. ——, 133 S.Ct. 2802, 186 L.Ed.2d 861 (2013); *T.Y.*, 584 F.3d at 419, *cert. denied,* 560 U.S. 904, 130 S.Ct. 3277, 176 L.Ed.2d 1183 (2010).

### 5. *Cumulative consideration of procedural violations*

■■■■ Procedural violations must be considered cumulatively because "[m]ultiple procedural violations may cumulatively result in the denial of a [free appropriate public education] even if the violations considered individually do not." *R.E.*, 694

F.3d at 190. Accordingly, I have also considered whether, in the aggregate, the lack of a functional behavioral assessment, coupled with the absence of provisions in the IEP for parental counseling or transitional support services, resulted in such a denial. As plaintiff has failed to identify how these procedural violations caused any harm, much less impeded R.R.'s education or M.S.'s participation in the IEP process, I conclude that, even considered cumulatively, they did not result in the violation of R.R.'s right to a free appropriate public education.[8]

### B. Substantive Compliance with the IDEA

#### 1. *Adequacy of speech and language therapy services*

■■■ Plaintiff argues that R.R. was denied an appropriate placement because the recommended level of speech therapy services set forth in the IEP was insufficient to address his intensive language needs.[9] In assessing the IEP's substantive adequacy, the State Review Officer carefully reviewed the record evidence regarding the speech therapy services required by R.R., including the three speech and language reports considered by the IEP team. The

---

8. Plaintiff suggests that the absence of parental counseling and transitional support services also may constitute substantive violations of the IDEA. Considering the broad array of services provided in the IEP directed at ensuring that R.R. would receive a meaningful education, and giving due weight to the State Review Officer's determination that these comprehensive services would "enable [R.R.] to receive educational benefits" (SRO Dec., at 11), I find by a preponderance of the evidence that the lack of transitional support services did not deprive R.R. of a free appropriate public education. Moreover, given that New York law requires that M.S. receive parental counseling, whether or not such counseling is set forth in an IEP, I find that this omission does not render the IEP substantively unreasonable.

9. To the extent that plaintiff also challenges the level of occupational therapy sessions recommended in the IEP, she is precluded from raising this claim here. The IHO held that the recommended occupational therapy sessions were sufficient to address R.R.'s needs, and plaintiff did not cross-appeal this finding to the State Review Officer. For the same reason, plaintiff is precluded from challenging any of the IHO's other findings in the Department's favor, namely, that: the IEP accurately described R.R.'s needs, the goals set forth therein were collaboratively developed, the recommended 12:1 + 1 class structure was appropriate, the behavioral plan adequately addressed R.R.'s behaviors, and the recommended counseling levels were appropriate. (*See id.* at 21.)

reports comprised an October 2010 Aaron School Speak and Language Therapy Plan, a November 2010 Speech and Language Progress Note, and a November 2010 Speech Language Therapy Progress Note (the "IDC Report"). The IDC Report, which analyzed R.R.'s speech skills and deficits in great detail, described R.R's moderate to severely delayed auditory comprehension skills, his significantly delayed expressive language skills, his difficulties with pragmatic language skills, and his moderate to severe receptive language delays. (SRO Dec. at 12.) In assessing R.R.'s speech language needs, these reports were sufficient to provide the IEP team with a full understanding of R.R.'s current levels of functional performance and his needs. (*Id.*) According to these reports, R.R. required speech language therapy to, among other things, "improve syntactic skills in order to narrate events, recall information, initiate and sustain conversation with familiar adults and peers, and on developing clear and intelligible written thoughts." (*Id.*)

As the State Review Officer noted, the IEP team then discussed R.R.'s speech-language deficits and his functioning levels when formulating annual goals and short-term objectives for R.R.'s speech therapy services. In creating these goals, the IEP team (with M.S.'s agreement) largely transposed the annual goals and short-term objectives from the Aaron school's therapy plans. (*Id.* at 13.) In his own review of these goals, the State Review Officer found that they "were specifically aligned to [R.R.'s] speech-language needs." (*Id.*) To address R.R.'s intensive needs, the IEP team recommended three weekly 30–minute speech therapy sessions on an individual basis, and two weekly sessions in a group of two students. At the due process hearing, a social worker (and IEP team member) explained that the IEP team selected this level of speech-language thera-

py "due, in part, to the student's age, and in part, because the recommended placement in a 12:1 + 1 special class would provide the student with language-based instruction within the classroom." (*Id.*)

Based on its own independent review of the record, the State Review Officer concluded that the IEP accurately described R.R.'s language needs and formulated appropriate annual goals and short-term objectives to target these needs, and that the IEP team carefully considered all of the relevant information prior to determining the level of services offered in the IEP. (*Id.* at 14.) Accordingly, the State Review Officer found that the recommended level of speech-therapy sessions did not "so insufficiently address[ ] the student's language needs that the student was denied a [free appropriate public education.]" (*Id.*) The IDEA does not guarantee children "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132, but rather only an education reasonably calculated to produce progress, rather than regression, *Cerra*, 427 F.3d at 195.

Moreover, the State Review Officer concluded that, even if the level of speech-language therapy itself were insufficient to address R.R.'s needs, "the IEP as a whole was reasonably calculated to enable the student to receive educational benefits, and thus offered the student a [free appropriate public education.]" *See Karl v. Bd. of Educ.*, 736 F.2d 873, 877 (2d Cir.1984) (holding that the educational benefits flowing from an IEP must be determined from the combination of offerings rather than the single components viewed by themselves). In particular, the State Review Officer found that the IEP "addressed [R.R.'s] speech-language needs related to social interaction and pragmatics, comprehension, and syntax by incorporating annual goals and short-term objectives specific

to his academic areas—such as reading, mathematics, and writing—as well as counseling." (*Id.* at 15.)

This sort of diligent and considered analysis of an educational issue "is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim,* 346 F.3d at 382; *see also R.E.,* 694 F.3d at 189 (holding that "[d]eterminations regarding the substantive adequacy of an IEP should be afforded more weight"); *M.H.,* 685 F.3d at 244 (same). Having reviewed the record, I find that the State Review Officer's decision is well-reasoned and deserves deference as the final state administrative determination, especially when compared to the single, conclusory statement in the IHO's decision that the level of services in the IEP was inconsistent with R.R.'s "intensive language needs." Giving due weight to the state administrative agency's specialized knowledge and experience, I conclude, by a preponderance of the evidence, that the State Review Officer did not err in finding that the IEP adequately addressed R.R.'s speech therapy needs.

### 2. *Implementation of the IEP*

Plaintiff argues that the Department's recommended placement was inappropriate because the Department did not show that the school was "ready, willing, and able" to implement the services set forth in the IEP. This argument is baseless. Plaintiff has pointed to no specific evidence suggesting that the recommended school would not have been able to implement the IEP as written.

In contrast to *B.R. v. N.Y.C. Dep't of Educ.,* 910 F.Supp.2d 670 (S.D.N.Y.2012), and *D.C. v. N.Y.C. Dep't of Educ.,* 950 F.Supp.2d 494 (S.D.N.Y.2013), the principal cases upon which plaintiff relies, plaintiff has cited no evidence suggesting that M.S. learned that P.S. 373 could not imple-

ment the IEP before she notified the Department that she was rejecting the placement. Most importantly, she offers no evidence that implementation was not possible.

■ Plaintiff's principal argument is that the recommended school could not have implemented the proposed IEP because the prospective classroom teacher lacked sufficient experience with children with autism and because R.R. would be placed in a classroom with intellectually disabled students. These objections to the IEP rely on speculation about how the IEP would (or would not) have been implemented. In *R.E.,* parents challenged the substantive adequacy of a school district's proposed placement by arguing that the recommended school was inadequate because the school routinely did not provide its students with the appropriate occupational therapy services. *Id.* at 194–95. The Second Circuit rejected the parents' challenge to the implementation of the IEP, holding that the appropriate inquiry is limited to the "written plan offered to the parents." *Id.* at 195. "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.,* 694 F.3d at 195.

■ Just as a school district may not justify the adequacy of an IEP based on evidence that a student would have been assigned a specific teacher, "or because of actions that specific teacher would have taken beyond what was listed in the IEP," a parent may not challenge the adequacy of a written IEP by attacking the qualifications or experience of the prospective classroom teacher. *Id.* at 187 (explaining that a school district "cannot guarantee that a particular teacher ... will not quit or become otherwise unavailable for the upcoming year"). Rather, "[t]he appropri-

ate inquiry is into the nature of the program actually offered in the written plan and therefore reasonably known to the parties at the time of the placement decision." *Id.* In sum, plaintiff's arguments based on the prospective classroom teacher's limited experience with autistic children and the characteristics of the other children in the classes she observed are not relevant to determining the appropriateness of the IEP.[10]

Plaintiff also argues that the Department failed to present any evidence (at the due process hearing or otherwise) about how the IEP would be implemented during the September 2011 to June 2012 portion of the school year and thus failed to meet its burden of showing in the state proceedings that the IEP was appropriate. Here again, plaintiff has no evidence, beyond mere conjecture, that the Department would not have adhered to the IEP. As to whether the Department had an affirmative duty to prove that it would be able to implement the IEP for the duration of the school year, a school district must only demonstrate that the IEP itself is adequate. *M.H.*, 685 F.3d at 224; *R.E.*, 694 F.3d at 187, 191; *T.Y.*, 584 F.3d at 419.

### C. Plaintiff's Remaining Arguments

I have considered plaintiff's remaining arguments and find them to be without merit. In particular, plaintiff's assertions of agency bias and the attempt to impugn the qualifications of the particular State Review Officer that heard M.S.'s adminis-

trative appeal are unsubstantiated in both law and fact, and have no bearing on this proceeding. I therefore conclude that plaintiff has not established, by a preponderance of the evidence, that the individualized education program offered to R.R. by the Department was inappropriate— that is, that R.R. was denied a free appropriate public education. Because I conclude that R.R.'s individualized education program was procedurally and substantively adequate, I need not consider whether his alternative private placement at the Aaron School was appropriate.

### CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is DENIED, the Department's cross-motion for summary judgment is GRANTED, and the Complaint is DISMISSED in its entirety. The Clerk of Court is directed to ender judgment accordingly.

**SO ORDERED.**

---

**10.** Plaintiff's arguments are also speculative. As with the identity of the classroom teacher, there is no guarantee as to the composition of the actual class that R.R. would have attended. The changing nature of classrooms is illustrated by the fact that the assistant principal informed M.S., during her brief tour of the placement school, that the composition of the classroom would change over the follow-

ing months. (*See* Oct. 25, 2011 IHO Hr'g Tr. at 311, 313–14.) Moreover, the IDEA does not provide a parent with veto power over a student's classroom or classmates, *see, e.g., R.E.*, 694 F.3d at 187, 195; *T.Y.*, 584 F.3d at 420, or prohibit the grouping of students with autism with students with intellectual disabilities, *see, e.g.,* 8 N.Y.C.R.R. § 200.6(a)(3).